**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

KRISTOPHER MICHAEL HEGGINS,  )
                                      )    Case No. 2:13-cv-00854
                                      )
           *Petitioner*,         )
                                        )
        v.                     )    Magistrate Judge Kezia O. L. Taylor
                                        )
THE ATTORNEY GENERAL OF    )
THE STATE OF PENNSYLVANIA,   )
WARDEN OF S.C.I. FRACKVILLE,  )
and DISTRICT ATTORNEY OF      )
ALLEGHENY,                    )
                                        )
          *Respondents*.     )
                                        )

## <u>MEMORAUNDUM OPINION</u>

Presently before the Court is an Amended Petition for Writ of Habeas Corpus ("Petition") filed by Kristopher Michael Heggins ("Petitioner") pursuant to 28 U.S.C. § 2254.  Petitioner challenges his judgment of sentence at CP-02-CR-0007504-2000 ("7504-2000") for robbery and criminal conspiracy, and at CP-02-CR-0007508-2000 ("7508-2000") for second-degree murder.  For the following reasons, the Petition will be denied and a certificate of appealability will also be denied.

### A.  <u>Factual Background and Procedural History</u>

The Pennsylvania Superior Court summarized the facts as follows:

> On January 28, 1997, police found Salvatore Brunsvold lying on the street in front of his home on Wellesley Avenue in Pittsburgh with a single gunshot wound to the head.  Emergency personnel transported Brunsvold by ambulance to the hospital where he was later pronounced dead.  Police recovered no physical evidence from the scene and were unable to develop a suspect from their initial investigation.

At the time of the shooting, [Petitioner] attended Peabody High School and lived with his parents in an apartment located at 924 North St. Clair Street, which intersected Wellesley Avenue. Two weeks after the murder, detectives interviewed [Petitioner] about the shooting. He indicated that on the night in question, he was standing at the front door of his residence speaking on the phone to his girlfriend. After hearing a gunshot, [Petitioner] went out to his porch to investigate. He told officers he saw a dark vehicle drive away from the intersection and provided them with the driver's name. Police continued to investigate, but the crime remained unsolved.

In June 1997, [Petitioner] was committed to the North Central Secure Treatment Facility in Danville, Pennsylvania ("Danville"), for offenses unrelated to this case. Danville is a maximum security juvenile treatment center designed to rehabilitate juvenile offenders. On three separate occasions, [Petitioner] made statements to Danville employees that suggested he was somehow involved in the Brunsvold murder. The Danville counselors informed police of [Petitioner]'s statements and, on December 10, 1997, Pittsburgh homicide detectives interviewed him about the shooting. [Petitioner] reiterated that he had been on his porch when he heard a gunshot; however, he provided police with a different name for the driver of the vehicle he saw drive away from the scene. [Petitioner] claimed he had previously lied about the driver's identity, but he was now telling the truth. Two years later on December 9, 1999, authorities again interviewed [Petitioner], who stated his intention to provide police with the identity of the shooter in exchange for consideration on a pending criminal charge. The proposed bargain eventually fell apart, and [Petitioner] provided no new information on the shooter. Police continued to investigate and began to look more closely at [Petitioner] as a potential suspect. The investigation culminated in April 2000, when police arrested [Petitioner] and charged him with criminal homicide. On September 20, 2000, the case against [Petitioner] proceeded to a jury trial.

The Commonwealth's allegations against [Petitioner] at trial consisted largely of testimony provided by the Danville counselors. [FN2] Counselor Allan Clark testified that as part of the Danville treatment plan, residents and counselors engage in family counseling sessions designed to re-unite the child with the family and re-establish trust by having the child disclose to the group the extent of any past criminal activity. Mr. Clark stated it was crucial for [Petitioner] to share his criminal lifestyle during counseling sessions because affirmative disclosure of past indiscretions was a foundational step towards the ultimate goal of rejecting one's criminal past and transitioning into a productive member of society. Mr. Clark then explained how [Petitioner]'s mother had raised the subject of the Brunsvold shooting during one session by asking [Petitioner] if he had been involved in the murder. Mr. Clark testified [Petitioner] told his mother he was an eyewitness to the shooting and knew who the shooter was. [Petitioner] admitted he had previously lied to the police about the shooter's identity.

> FN2    Danville informed [Petitioner] and all other residents that their statements at Danville were not confidential and could be reported to law enforcement in appropriate circumstances. [Petitioner] has not asserted, either on direct review or now, that his statements were protected by any privilege.

Donna Heath was the second Danville counselor who testified for the Commonwealth. Ms. Heath was [Petitioner]'s primary counselor and, as such, she met with him to discuss the importance of being honest with his family about his past. She indicated the counseling sessions revealed [Petitioner]'s family was unaware of the extent of his criminal street life. Ms. Heath discussed how she stressed with [Petitioner] the need for him to show remorse for his illicit behavior and mentioned how [Petitioner]'s "problems with the system" were causing his family to lose sleep at night. During the sessions, Ms. Heath also probed [Petitioner] on the Brunsvold murder, and [Petitioner] told her he had been teaching a friend how to commit a robbery when his friend became nervous and shot Mr. Brunsvold. [Petitioner] stated he and his friend both fled, but [Petitioner] refused to identify the friend.

Counselor three, William Groover, testified about a third statement [Petitioner] made concerning the Brunsvold murder. Mr. Groover encouraged [Petitioner] to come forward with information involving the murder and commented on the brutal nature of the crime, to which [Petitioner] replied, "it didn't happen like that when we killed the priest." [FN3] Mr. Groover stated that, in observing [Petitioner]'s body language and demeanor at the time, the statement seemed to constitute a "slip." Mr. Groover did not recall the context in which [Petitioner] had made this statement or the question that prompted [Petitioner]'s remark about killing the priest, or any later discussions from that session. In subsequent sessions, counselors further pressed [Petitioner] about his involvement in the murder, but [Petitioner] maintained he was merely an eyewitness.

> FN3    Mr. Brunsvold was a campus minister at Carnegie Mellon University and the University of Pittsburgh.

After the Danville witnesses provided extensive testimony concerning [Petitioner]'s criminal street life and gang involvement, [Petitioner] took the stand, in part, to explain his past behavior. On direct examination, counsel elicited testimony from [Petitioner] concerning his past criminal convictions for burglary, receiving stolen property, possession of a firearm, and harassment. [Petitioner] acknowledged his convictions; but he expressed remorse and claimed he had learned from his mistakes.

Much of [Petitioner]'s testimony on direct examination focused on the statements attributed to him by the Danville counselors. Trial counsel proceeded under the theory [Petitioner] had made these incriminating statements because he believed his "cooperation" would allow him to accelerate his release from Danville. [Petitioner] testified consistently with this theory concerning the admission to Allan Clark. He claimed he lied about witnessing the murder in an attempt to leave the facility as soon as possible. With regard to the statement made to Donna Heath, however, [Petitioner] denied having ever told her he was teaching someone to commit a robbery when the individual shot Mr. Brunsvold. Further, [Petitioner] denied making the statement about "killing the priest" to William Groover.

In conjunction with his denials, [Petitioner] offered an alibi defense. He testified that at the time of the murder he was enrolled in the Allegheny Academy program for juveniles. The program involved after school supervision, followed up by curfew calls at night. The calls were unscheduled and designed to enhance after-hours supervision by ensuring participants were at home and off the streets. [Petitioner] claimed that, on the night of the shooting, Academy personnel dropped him off at his home around 9:00 p.m.; and he did not leave the third floor of the apartment. He heard the gunshot and went to the window to survey the scene. It was at some point after the gunfire, between 10:00 p.m. and 10:30 p.m., that he answered a phone call from the Academy. [Petitioner]'s mother testified to the same effect, stating [Petitioner] was on the third floor of their apartment when she heard a loud noise, after which he ran downstairs and told her it was a gunshot.

On October 2, 2020, the jury convicted [Petitioner] of second degree murder. The court sentenced [Petitioner] to a mandatory term of life imprisonment without parole.

ECF No. 47-1 at 758-64.

On October 26, 2000, Petitioner's trial counsel, Attorney G. William Bills, Jr. ("Attorney Bills"), moved to withdraw as counsel and to appoint the Public Defender's Office noting that the family did not have the financial resources to retain a private attorney to appeal, although Attorney Bills did file the notice of appeal itself. *Id*. at 221-24, 226-35. The trial court granted Attorney Bills permission to withdraw and appointed Attorney James R. Wilson ("Attorney Wilson") from the Public Defender's Office for purposes of appealing Petitioner's judgment of sentence. *Id*. at 225. In June 2001, while Petitioner's appeal was pending before the Superior Court, the prosecutor

for Petitioner's case, Assistant District Attorney Daniel E. Fitzsimmons ("ADA Fitzsimmons") received a laboratory report from the Allegheny County Coroner's Office indicating that the same gun that was used in the murder of Salvatore Brunsvold was also used in an aggravated assault on victim Richard Milton by suspect George Robinson on September 25, 2000, the day before Petitioner's jury trial began ("the Robinson evidence"). As a result of this report, on August 7, 2001, Attorney Bills filed a Motion for New Trial based on after-discovered evidence pursuant to Pennsylvania Rule of Criminal Procedure 720(C). *Id*. at 250-73. On August 22, 2001, the trial court entered an order deferring judgment on the Motion pending Petitioner's direct appeal. *Id*. at 274. Petitioner's judgment of sentence was affirmed by the Superior Court on September 18, 2002, and his application for reargument was denied on November 27, 2002. *Id*. at 347-62, 409. The Pennsylvania Supreme Court denied allowance of appeal on June 20, 2003. *Id*. at 476.

Petitioner filed a *pro se* Petition pursuant to Pennsylvania's Post-Conviction Relief Act ("PCRA Petition"), his first of many, on March 15, 2004. *Id*. at 477-509. Attorney J. Richard Narvin ("Attorney Narvin") was appointed to represent Petitioner in those proceedings, and he filed an Amended PCRA Petition on Petitioner's behalf on July 16, 2007. *Id*. at 510, 513-33. The PCRA court issued its Notice of Intent to dismiss the Amended PCRA Petition on August 27, 2007, and the PCRA court entered its order of dismissal on September 17, 2007. *Id*. at 559, 565. However, the PCRA court granted Attorney Narvin's Motion for Reconsideration of its dismissal, thereby vacating its order and scheduling the case for an evidentiary hearing. *Id*. at 571-76, 577. After two changes of counsel and several postponements, an evidentiary hearing was eventually held on April 21, 2010, and a second hearing was held on September 22, 2010. At the conclusion of the second hearing, the PCRA court granted relief in the form of a new trial on Petitioner's

claims that trial counsel was ineffective for failing to object to the testimony of Danville witnesses regarding Petitioner's supposed gang membership and past criminal activity and for introducing Petitioner's otherwise inadmissible prior convictions. *Id*. at 647. The Commonwealth appealed, and on May 9, 2012, the Superior Court reversed finding that the PCRA court erred when it granted Petitioner a new trial on the grounds alleged. *Id*. at 758-73. A request for reargument or reconsideration of that order was filed by Petitioner on June 15, 2012. *Id*. at 774-818.

On July 10, 2012, Petitioner filed another *pro se* PCRA Petition raising a claim that his mandatory life without parole sentence was unconstitutional pursuant to the United States Supreme Court's then recent decision in *Miller v. Alabama*, 567 U.S. 460 (2012), which was decided on June 25, 2012. *Id*. at 819-21. At the time the PCRA Petition was filed, Petitioner's request for reargument or reconsideration was still pending before the Superior Court in relation to that court's order dated May 9, 2012, and because Petitioner would have had to withdraw that request in order to return jurisdiction to the PCRA court to consider his new *pro se* PCRA Petition, Petitioner's appointed counsel moved to withdraw the *pro se* PCRA Petition. *Id*. at 822-25. That request was granted on July 23, 2012, and, shortly thereafter, on August 9, 2012, the Superior Court denied the request for reargument or reconsideration. *Id*. at 826, 827. Allowance of appeal was denied by the Pennsylvania Supreme Court on August 27, 2013. *Id*. at 886-87.

On October 24, 2013, Petitioner filed a *pro se* amendment or continuation to his 2004 PCRA petition that was construed by the PCRA court to be his third PCRA petition. *Id*. at 888-930. In this filing, Petitioner asked the PCRA court to address claims that he argued were undecided by the PCRA court in 2010, and he also raised arguments as to the constitutionality of his life without parole sentence under *Miller*. *Id*. On December 26, 2013, Petitioner filed a *pro se*

request to amend his *pro se* PCRA Petition that he filed in July 2012. *Id*. at 931-54. Attorney Narvin was appointed to represent Petitioner in the PCRA proceedings, and he later filed a Motion to Withdraw as counsel, along with a Turner/Finley No-Merit Letter on July 17, 2014. *Id*. at 955-63. On July 21, 2014, the PCRA court granted his request to withdraw and issued its Notice of Intent to dismiss Petitioner's third PCRA Petition. *Id*. at 964. It later issued an order on August 18, 2014, dismissing the third PCRA Petition as untimely. *Id*. at 980. Petitioner appealed, and while his case was pending before the Superior Court, he filed a *pro se* motion requesting that the PCRA court rule on issues still outstanding, specifically the claims raised in his first PCRA Petition on which the PCRA court did not grant him relief. *Id*. at 996-98. That motion was denied in an order dated June 1, 2015, with the court noting that all prior PCRA petitions filed by Petitioner had been fully litigated. *Id*. at 1013. During the pendency of his appeal, on February 18, 2016, Petitioner also filed another *pro se* PCRA Petition, his fourth, raising another *Miller* claim in conjunction with the *Miller* retroactivity ruling issued by the United States Supreme Court in *Montgomery v. Louisiana*, 577 U.S. 190 (2016). *Id*. at 1092-95. PCRA counsel was appointed who, on March 1, 2016, filed an Amended PCRA Petition on Petitioner's behalf and filed in the Superior Court a Petition to Remand so that the PCRA court could consider the issues raised in the Amended PCRA Petition. *Id*. at 1100-03, 1104-18. On March 15, 2016, the Superior Court issued an order reversing the PCRA court's order of dismissal dated July 21, 2014, and it remanded the case for resentencing in light of *Miller* and *Montgomery*. *Id*. at 1119-31. The Petition to Remand to consider the Amended PCRA Petition was denied for mootness. *Id*.

On August 10, 2016, Petitioner was resentenced to thirty years to life with the possibility of parole. *Id*. at 1206-07, 1208. He filed post-sentence motions that were denied by order dated

November 4, 2016.  *Id*. at 1209-1213, 1214.  Petitioner appealed, and, on January 3, 2019, the Superior Court vacated Petitioner's judgment of sentence and remanded for further proceedings consistent with its opinion.  *Id*. at 1523-37.  On October 15, 2019, Petitioner was resentenced to twenty-five years to life with the possibility of parole.  *Id*. at 1779-85, 1786-91.

### B.  Federal Habeas Standards

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, April 24, 1996 ("AEDPA"), habeas relief is only available for "a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

An application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  For purposes of § 2254(d), a claim has been "adjudicated on the merits in State court proceedings" when the state court made a decision that finally resolves the claim based on its substance, not on a procedural, or other, ground.  *See*, *e.g.*, *Harrington v. Richter*, 562 U.S. 86, 98-100 (2011); *Robinson v. Beard*, 762 F.3d 316, 324 (3d Cir. 2014).

The majority of federal habeas claims need only be analyzed under § 2254(d)(1), which applies to questions of law and mixed questions of law and fact.  In applying § 2254(d)(1), the federal habeas court's first task is to ascertain what law falls within the scope of the "clearly

established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1). The phrase "clearly established," as the term is used in § 2254(d)(1), "refers to the holdings, as opposed to the dicta, of the [United States Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 363, 412 (2000). Thus, "clearly established Federal law" is restricted to "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

Once the "clearly established Federal law, as determined by the Supreme Court of the United States" is ascertained, the federal habeas court must determine whether the state court's adjudication of the claim at issue was "contrary to" that law. *Williams*, 529 U.S. at 404-05 (explaining that the "contrary to" and "unreasonable application of" clauses of § 2254(d)(1) have independent meaning). A state-court adjudication is "contrary to" clearly established Federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Id*. at 405, 406. A "run-of-the-mill" state-court adjudication applying the correct legal rule from Supreme Court decisions to the facts of a particular case will not be "contrary to" Supreme Court precedent. *Id*. at 406. Thus, the issue in most federal habeas cases is whether the adjudication by the state court survives under § 2254(d)(1)'s "unreasonable application" clause.

A state court decision is an "unreasonable application" of clearly established Federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*,

529 U.S. at 413. To satisfy his burden under this provision of AEDPA's standard of review, the

petitioner must do more than convince the federal habeas court that the state court's decision was

incorrect. He must show that it "was objectively unreasonable." *Id*. at 409. This means that the

petitioner must prove that the state court's decision "was so lacking in justification that there was

an error well understood and comprehended in existing law beyond any possibility for fairminded

disagreement." *Richter*, 562 U.S. at 103.

> As the Supreme Court has noted:

> …. It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *See Lockyer*, *supra*, at 75, 123 S. Ct. 1166.

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further.

*Richter*, 562 U.S. at 102.

If a petitioner is able to satisfy the requirements of § 2254(d)(1), then the state court

decision is not entitled to deference under AEDPA and the federal habeas court proceeds to a *de*

*novo* evaluation of the constitutional claim on the merits. *See Tucker v. Superintendent Graterford*

*SCI*, 677 F. App'x 768, 776 (3d Cir. 2017) (citing *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007)

("When . . . the requirement set forth in § 2254(d)(1) is satisfied[,] [a] federal court must then

resolve the claim without the deference AEDPA otherwise requires."). The Court of Appeals for

the Third Circuit has explained that,

> [w]hile a determination that a state court's analysis is contrary to or an unreasonable application of clearly established federal law is necessary to grant habeas relief, it

> is not alone sufficient.  That is because, despite applying an improper analysis, the state court still may have reached the correct result, and a federal court can only grant the Great Writ if it is "firmly convinced that a federal constitutional right has been violated," *Williams*, 529 U.S. at 389, 120 S.Ct. 1495.  *See also Horn v. Banks*, 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) ("[w]hile it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review . . . none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard").  Thus, when a federal court reviewing a habeas petition concludes that the state court analyzed the petitioner's claim in a manner that contravenes clearly established federal law, it then must proceed to review the merits of the claim de novo to evaluate if a constitutional violation occurred.  *See Lafler v. Cooper*, 566 U.S. 156, 174, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012).

*Vickers v. Superintendent Graterford SCI*, 858 F.3d 841, 848-89 (3d Cir. 2017) (internal footnote omitted).

The standard of review set forth at § 2254(d)(2) applies when a petitioner "challenges the factual basis for" the state court's "decision rejecting a claim[.]"  *Burt v. Titlow*, 571 U.S. 12, 18 (2013).  "[A] state court decision is based on an 'unreasonable determination of the facts' if the state court's factual findings are 'objectively unreasonable in light of the evidence presented in the state-court proceeding,' which requires review of whether there was sufficient evidence to support the state court's factual findings."  *Dennis v. Secretary, Pennsylvania Department of Corrections*, 834 F.3d 263, 281 (3d Cir. 2016) (quoting § 2254(d)(2) and citing *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).  "'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'"  *Burt*, 571 U.S. at 18 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)); *see Rice v. Collins*, 546 U.S. 333, 342 (2006) (reversing court of appeals' decision because "[t]he panel majority's attempt to use a set of debatable inferences to set aside the conclusion reached by the state court does not satisfy AEDPA's requirements for granting a writ of habeas corpus.").  Thus, "if '[r]easonable minds

reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede'" the state court's adjudication. *Woods*, 558 U.S. at 301 (quoting *Collins*, 546 U.S. at 341-42).

If the state court did not adjudicate a claim on the merits, the federal habeas court must determine whether that was because the petitioner procedurally defaulted it. *See, e.g., Carpenter v. Vaughn*, 296 F.3d 138, 146 (3d Cir. 2002). If the claim is not defaulted, or if the petitioner has established grounds to excuse his default, the standard of review at § 2254(d) does not apply and the habeas court reviews the claim *de novo. See, e.g., Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). However, in all cases and regardless of whether the standard of review at § 2254(d) applies, the state court's factual determinations are presumed to be correct under § 2254(e)(1) unless the petitioner rebuts that presumption by clear and convincing evidence. *Palmer v. Hendricks*, 592 F.3d 386, 392 (3d Cir. 2010); *Nara v. Frank*, 488 F.3d 187, 201 (3d Cir. 2007) ("the § 2254(e)(1) presumption of correctness applies regardless of whether there has been an 'adjudication on the merits' for purposes of § 2254(d).") (citing *Appel*, 250 F.3d at 210).

### C. <u>Discussion</u>

The following claims are raised in the Petition before the Court:

1. Ineffective assistance of counsel by Attorney Bills for failing to properly raise the Robinson evidence before the trial court.

2. Ineffective assistance of counsel by Attorney Bills for failing to invoke the protections of Pennsylvania law to exclude Petitioner's statements made to Danville counselors.

3. Ineffective assistance of counsel by Attorney Bills for failing to "appropriately handle" the continued references to Petitioner's criminality, criminal lifestyle, gang involvement, and other bad behavior at trial.

4.   Ineffective assistance of counsel by Attorney Bills for eliciting testimony from
     Petitioner at trial regarding past crimes that was otherwise inadmissible.

5.   The cumulative prejudice of Attorney Bills' actions before, during and after
     trial denied Petitioner his constitutional right to due process.  Specifically, (i)
     Attorney Bills' pretrial motion strategy was inconsistent with his theory of the
     defense at trial, (ii) On the morning of the trial, Attorney Bills confessed that
     he was unfamiliar with Groover's purported testimony, and (iii) Attorney Bills
     failed to elicit testimony from Petitioner that in 1999 he told police that he heard
     a "shotgun blast from up the street" from his porch.

6.   The state court's refusal to adjudicate Petitioner's after-acquired evidence claim
     violated his right to procedural due process.

ECF No. 36.

### 1.   <u>Claim six is not cognizable on federal habeas review.</u>

The Court will start with claim six, wherein Petitioner argues that the PCRA court failed

to address his after-discovered evidence claim related to the Robinson evidence that was raised in

his first PCRA proceedings and then later erroneously determined that all prior PCRA petitions

had been fully litigated when he attempted to have the PCRA court rule on the outstanding claim.

Petitioner argues that the PCRA court's refusal to adjudicate his after-discovered evidence claim

amounted to a procedural due process violation.  *See* ECF No. 36 at 68-71.

Federal habeas proceedings are "not the appropriate forum" for Petitioner to pursue his

claims of alleged error in his PCRA proceedings.  *Lambert v. Blackwell*, 387 F.3d 210, 247 (3d

Cir. 2004).   In *Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998), the Third Circuit

explained:

> The federal courts are authorized to provide collateral relief where a petitioner is in
> state custody or under a federal sentence imposed in violation of the Constitution
> or the laws or treaties of the United States.  28 U.S.C. §§ 2254, 2255.  Thus, the
> federal role in reviewing an application for habeas corpus is limited to evaluating
> what occurred in the state or federal proceedings that actually led to the petitioner's
> conviction; what occurred in the petitioner's collateral proceeding does not enter

into the habeas calculation. We have often noted the general proposition that habeas proceedings are "hybrid actions"; they are "independent civil dispositions of completed criminal proceedings." Federal habeas power is "limited . . . to a determination of whether there has been an improper detention by virtue of the state court judgment."

*Id*. at 945-55 (internal citations omitted). Because claim six solely seeks relief based on the alleged errors committed by the PCRA court in Petitioner's post-conviction proceedings, it must be dismissed as a non-cognizable claim.

### 2. **Claims one, two, five and six are procedurally defaulted.**

Claims one, two, five and six (to the extent it is cognizable) are procedurally defaulted because they were never fairly presented to the state courts and any attempt by Petitioner to do so now would be untimely. Additionally, Petitioner has not established the applicability of any recognized exception to the procedural default rule that would permit this Court to review these claims *de novo*.

### a. **Exhaustion and Procedural Default**

The provisions of the federal habeas corpus statute at 28 U.S.C. § 2254(b) require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief. This "exhaustion" requirement is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). It "is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal court[.]" *O'Sullivan v. Boerckel*, 562 U.S. 838, 845 (1999).

In order to "exhaust" a federal constitutional claim, a state prisoner must "fairly present" it through the proper procedures in state court before he litigates the claim in a federal habeas

petition. *Lines v. Larkins*, 208 F.3d 153, 159 (3d Cir. 2000) (citing 28 U.S.C. § 2254(b)); *see also O'Sullivan*, 526 U.S. at 848; *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997). This requires the state prisoner to have "invoke[d] one complete round of the State's established appellate review process[,]" in order to satisfy the exhaustion requirement. In Pennsylvania, this means that a petitioner in a non-capital case such as this one must have first presented every federal constitutional claim raised in his federal habeas petition to the Superior Court either on direct or PCRA appeal. *See*, *e.g.*, *Lambert v. Blackwell*, 387 F.3d 210, 233-34 (3d Cir. 2004).

"When a claim is not exhausted because it has not been 'fairly presented' to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.'" *McCandless*, 172 F.3d at 260. However, in such cases applicants are considered to have procedurally defaulted their claims. *See Rolan v. Coleman*, 680 F.3d 311, 317 (3d Cir. 2012). A Pennsylvania state prisoner in a non-capital case defaults a federal habeas claim if he: (a) failed to present it to the state courts and he cannot do so now because the state courts would decline to address the claim on the merits due to state procedural rules that would bar such consideration (such as, for example, the PCRA's one-year statute of limitations); or (b) failed to comply with a state procedural rule when he presented the claim to the state court, and for that reason the state court declined to address the federal claim on the merits (often referred to as the "adequate and independent state ground doctrine"). *Id.* ("Procedural default occurs when a claim has not been fairly presented to the state courts . . . and there is no additional state remedies available to pursue . . . or, when an issue is properly asserted in the state system but not addressed on the merits because of an independent and adequate state procedural rule . . . .").

15

Federal courts may not consider procedurally defaulted claims absent a petitioner's satisfaction of an exception to the procedural default rule, for example, "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[] will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

To show a fundamental miscarriage of justice, a petitioner must demonstrate that he is actually innocent of the crime, *McCleskey v. Zant*, 499 U.S. 467, 494 (1991), by presenting "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error[,]" *Schlup v. Delo*, 513 U.S. 298, 316 (1995). However, it is most often the case that petitioners will allege cause and prejudice to overcome a procedural default. To show cause, a petitioner must demonstrate that "some objective factor external to the defense" prevented compliance with the state's procedural requirements. *Id*. at 753 (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). A factor is external to the defense if it "cannot fairly be attributed to" the prisoner. *Id*. The Supreme Court has explained:

> It has long been the rule that attorney error is an objective external factor providing cause for excusing a procedural default only if that error amounted to a deprivation of the constitutional right to counsel. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). An error amounting to constitutionally ineffective assistance is "imputed to the State" and is therefore external to the prisoner. *Murray*, *supra*, at 488. Attorney error that does not violate the Constitution, however, is attributed to the prisoner under "well-settled principles of agency law." *Coleman*, *supra*, at 754. It follows, then, that in proceedings for which the Constitution does not guarantee the assistance of counsel at all, attorney error cannot provide cause to excuse a default.

*Davila v. Davis*, 582 U.S. 521, 528-29 (2017).

The general rule is that, because there is no federal constitutional right to counsel in a PCRA proceeding, a petitioner cannot rely on PCRA counsel's ineffectiveness to establish the "cause" necessary to overcome the default of a federal habeas claim. *Id.* at 529 (citing *Coleman*, 501 U.S. at 755). In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court announced a narrow exception to this rule. In relevant part, it held that in states like Pennsylvania, where the law requires that claims of ineffective assistance of trial counsel be raised for the first time in a collateral proceeding, a petitioner may overcome the default of a claim of trial counsel's ineffectiveness. To do so, the petitioner must show: (1) the defaulted claim of trial counsel's ineffectiveness is "substantial"[1] and (2) PCRA counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984) for failing to raise that claim in the "initial review collateral proceeding." *Martinez*, 566 U.S. at 17. The holding in *Martinez* is limited to defaulted claims asserting trial counsel was ineffective. *See, e.g., Davila*, 582 U.S. at 529-31. It does not apply to any other type of defaulted claim. *Id.*

Importantly, the United States Supreme Court recently limited the effect of *Martinez*. In *Shinn v. Ramirez*, 596 U.S. 366 (2022), the Supreme Court held that when a petitioner faults his PCRA counsel for failing to raise and develop evidence to support a defaulted habeas claim, the federal habeas court is prohibited from holding an evidentiary hearing or otherwise expanding the state court record to permit the petitioner to introduce evidence to support a merits review of that

---

[1] The Third Circuit has explained that an ineffective assistance of counsel claim is "substantial" if it has "some merit." *Workman v. Sup't Albion SCI*, 915 F.3d 928, 938 (3d Cir. 2019). The evaluation is the same one that a federal court undertakes when it considers whether to grant a certificate of appealability. *Id.; Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Thus, a petitioner "must 'show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should be resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.'" *Id.* (quoting *Martinez*, 566 U.S. at 14).

claim unless the petitioner has satisfied one of the two narrow exceptions to AEDPA's general bar on evidentiary hearings found in 28 U.S.C. § 2254(e)(2).  *Id*. at 389 (holding that a habeas court "may not consider [new] evidence on the merits of a negligent prisoner's defaulted claim unless the exceptions in § 2254(e)(2) are satisfied."); *see also Williams v. Superintendent Mahanoy, SCI*, 45 F.4th 713, 724 (3d Cir. 2022) (noting that AEDPA's prohibition is not limited to formal evidentiary hearings and applies whenever the petitioner wants to expand the record beyond that developed in state court).

After *Shinn*, the Third Circuit clarified that the proper procedure for determining whether to excuse a petitioner's procedural default is to first "decide whether an underlying ineffectiveness claim succeeds considering only the state court record[.]"  *Williams*, 45 F.4th at 724.  Only then may a district court proceed with a *Martinez* hearing to evaluate whether post-conviction counsel was also ineffective.  *Id*. (citing *Cristin v. Brennan*, 281 F.3d 404, 413-19 (3d Cir. 2002)).  If the state court record alone does not allow the petitioner to succeed on the underlying ineffectiveness claim, then the federal habeas court "must skip hearings altogether and deny habeas relief[.]"  *Id*.; *see also id*. at 720 (explaining that the court "need not dwell" on the issue of whether the petitioner can overcome his default if the petitioner cannot show that his trial counsel was ineffective when considering only the facts developed in state court).

### b.  <u>Applicability of *Martinez*</u>

With respect to his two procedurally defaulted claims of ineffective assistance of trial counsel (claims one and two), Petitioner invokes the exception in *Martinez*.  *See* ECF No. 53 at 6-12.  Petitioner states that *Martinez* applies because his first meaningful opportunity to allege claims of ineffective assistance of trial counsel was in his PCRA proceedings, and he argues that PCRA

counsel was ineffective for failing to raise these meritorious claims of ineffective assistance of trial counsel. *Id.* The rule in *Martinez*, however, does not apply to Petitioner's case.

Despite Petitioner's argument to the contrary, his first meaningful opportunity to allege claims of ineffective assistance of trial counsel was in his direct appeal. Although the Pennsylvania Supreme Court held in *Commonwealth v. Grant*, 813 A.2d 726 (2002), that claims of ineffective assistance of counsel should be raised for the first time in collateral review proceedings, Petitioner's direct appeal of his initial judgment of sentence was decided prior to *Grant*, and, under Pennsylvania procedural rules in effect at that time, a criminal defendant had to raise an ineffective assistance of trial counsel claim as soon as his ineffective counsel no longer represented him.[2] *See Commonwealth v. Hubbard*, 372 A.2d 687, 695 n.6 (1977), *overruled by Grant*, 813 A.3d at 738. Here, Petitioner was not represented by Attorney Bills, his trial counsel, on direct appeal, and, therefore, in this case, Petitioner's first opportunity to raise claims alleging the ineffective assistance of Attorney Bills was on direct appeal. In a very similar pre-*Grant* case, the Third Circuit found that the *Martinez* exception for the petitioner's procedurally defaulted claims of ineffective assistance of trial counsel did not apply because Pennsylvania's pre-*Grant* law did not explicitly or effectively foreclose review of those claims on direct appeal. *See Gonzalez v. Superintendent Houtzdale SCI*, 802 F. App'x 45, 49-50 (3d Cir. 2020). Here, just like in *Gonzalez*, Petitioner's PCRA proceeding was not an "initial-review collateral proceeding" as defined by *Martinez*, and it certainly was not "'virtually impossible,' as a practical matter,"[3] *Cox v. Horn*, 757

---

[2] The Pennsylvania Superior Court affirmed Petitioner's judgment of sentence on September 18, 2002, and the Pennsylvania Supreme Court issued its decision in *Grant* on December 31, 2002.

[3] In *Cox*, the Third Circuit declined to decide whether, through *Trevino*, the holding in *Martinez* applied to the pre-*Grant* paradigm in Pennsylvania. *Cox*, 757 F.3d at 124 n.8. Similar to

F.3d 113, 119 (3d Cir. 2014) (quoting *Trevino v. Thaler*, 569 U.S. 413, 423 (2013)), for Petitioner to raise his claims of ineffective assistance of trial counsel in his direct appeal proceedings. Indeed, through his appellate counsel, Attorney Wilson, Petitioner raised a claim of ineffective assistance of trial counsel and the Superior Court addressed the merits of that claim on appeal. Therefore, for the same reasons stated by the Third Circuit in *Gonzalez*, this Court finds that Petitioner cannot use *Martinez* to overcome the procedural default of his ineffective assistance of trial counsel claims.

Perhaps anticipating the inapplicability of *Martinez*, Petitioner argues that he did not have a "meaningful opportunity" to raise claims of ineffective assistance of trial counsel on direct appeal because his lawyer "was operating under a conflict" with regard to George Robinson. ECF No. 53 at 7-8, FN 11. Specifically, Petitioner states that he was advised by his appellate counsel, Attorney Wilson, that he had not, and could not, speak to George Robinson regarding the history of the gun which Robinson used in his aggravated assault case, and which was used to kill Salvatore Brunsvold, because his office, the Allegheny County Public Defender's Office, was representing Robinson in his criminal case. Therefore, Attorney Wilson recommended that Petitioner "hire a private attorney to handle [that] aspect of his case" and specifically advised that Petitioner "not hire [Attorney] Bills for that purpose" since he was alleging Attorney Bills' ineffectiveness on appeal. ECF No. 36-19.

---

Petitioner, the petitioner in *Cox* litigated his direct appeal prior to *Grant*. However, in *Cox*, unlike the situation in this case, the same attorney represented the petitioner at trial and on direct appeal, and, therefore, the petitioner in *Cox* was not obligated to assert claims of ineffective assistance of trial counsel on direct appeal.

To the extent Petitioner may have been foreclosed from raising on direct appeal his ineffective assistance of counsel claim concerning the Robinson evidence (claim one) due to the alleged conflict with his direct appeal counsel, and the exception in *Martinez* arguably applies, the Court finds, for the following reasons, that Petitioner has not demonstrated that his defaulted claim is "substantial."[4]  *See*, *supra*, FN 2.  In other words, Petitioner has not demonstrated that there is any merit, let alone "some merit," to his claim that Attorney Bills was ineffective for failing to properly raise the Robinson evidence before the trial court by requesting a remand of the case in the Motion for New Trial.

The following background provides context for claim one.  Sometime in late June 2001, which was approximately eight months after Petitioner was convicted, ADA Fitzsimmons received and produced to Attorney Bills two Reports of Laboratory Findings from the Allegheny County Coroner's Office dated November 13, 2000, and November 14, 2000, which indicated that the gun used to kill Mr. Brunsvold was also used in the aggravated assault of Richard Milton by George Robinson on September 25, 2000.  When Attorney Bills received the lab reports on June 26, 2001, he was no longer Petitioner's counsel, having already been granted leave to withdraw from the case on October 30, 2000, due to the family's financial constraints.  Instead, Petitioner was represented by Attorney Wilson of the Public Defender's Office, and, at that time, Petitioner's direct appeal was pending before the Superior Court, although it had not yet been briefed by the parties.  In a letter dated July 30, 2001, Petitioner gave Attorney Bills "full authorization" and

---

[4] The Court finds no merit to any argument Petitioner may be making that the alleged conflict also prevented him from raising his other procedurally defaulted claim of ineffective assistance of counsel (claim two) on direct appeal.

"permission" to file all motions pertaining to the lab reports he had just received.[5]  Approximately one week later, on August 7, 2001, Attorney Bills filed, pursuant to Pennsylvania Rule of Criminal Procedure 720(C), a Motion for New Trial[6] based on the new evidence tying Robinson to the gun used to kill Mr. Brunsvold.  Although the Motion for New Trial included a request for an evidentiary hearing, it did not include a request for remand, and, on August 22, 2001, the trial court entered an order deferring judgment on the Motion due to the pendency of Petitioner's direct appeal and noting that the Motion would be ruled on if the Superior Court were to remand the case.  On September 18, 2002, the Superior Court affirmed Petitioner's judgment of sentence with the Motion for New Trial never being revisited thereafter.

Petitioner's claim one faults Attorney Bills for failing to request a remand in the Rule 720(C) Motion so that the trial court could have considered the Robinson evidence.  However,

---

[5] Although not mentioned in the briefings or anywhere in the state court record, one can presume based on Petitioner's letter that Attorney Bills somehow informed Petitioner of the receipt of the lab reports and sought guidance on how Petitioner wanted to proceed on the matter given that he was no longer Petitioner's attorney.

[6] At the time, Rule 720(C) read:

> **(C) After-Discovered Evidence.**  A motion for a new trial on the ground of after-discovered evidence must be filed in writing promptly after such discovery.  If an appeal is pending, the judge may grant the motion only upon remand of the case.

Pa.R.Crim.P. 720(C).  Petitioner makes several arguments throughout his briefs that Attorney Bills did nothing for two months after receiving the Robinson evidence and therefore "failed to act promptly" in compliance with Rule 720(C).  Given that Attorney Bills was not Petitioner's attorney when he received the lab reports and that Attorney Bills had to receive authorization from Petitioner prior to filing any motion on his behalf concerning the evidence, the Court finds these arguments without any record support.  The record demonstrates that Attorney Bills promptly notified Petitioner after receiving the evidence and filed the Motion for New Trial approximately one week after Petitioner authorized him to file it.

Petitioner cannot show that there is a reasonable probability that, even if Attorney Bills had included the request for remand, his after-discovered evidence claim relating to the Robinson evidence would have been successful since the very same after-discovered evidence claim was later advanced, *and denied*, in Petitioner's PCRA proceedings. Specifically, at the first evidentiary hearing in Petitioner's PCRA proceedings, his counsel, Attorney Narvin, introduced the lab reports[7] and argued that it was exculpatory evidence that would have altered the outcome of Petitioner's trial had it been available. In rebuttal, the Commonwealth elicited testimony from Brian Weismantel, a detective with the City of Pittsburgh Police Department's Homicide Division, who testified that in his experience it was common for guns to "travel" and for the same gun to be used in multiple, unrelated incidents by people who have no connection to one another. He provided examples of cases involving multiple shooting incidents where the only connection was the firearm and he testified to a crime report showing that thirteen firearms touched approximately thirty to forty different cases in Pittsburgh and Allegheny County over a period of two-and-a-half years. While Petitioner was ultimately granted PCRA relief in the form of a new trial on his two ineffective assistance of counsel claims, the PCRA court stated at the close of the second hearing that it was not persuaded by "[t]he fact that the gun was found later belonging to someone else." Transcript of Evidentiary Hearing dated September 22, 2010 at 7. The Commonwealth pursued a successful appeal of the PCRA court's grant of relief in the form of a new trial, but Petitioner did not file a cross-appeal contesting the PCRA court's failure to grant him relief on his after-discovered evidence claim.

---

[7] The authenticity of the report was stipulated to by the Commonwealth in the hearing.

According to Petitioner, any belief that the PCRA court actually denied his after-discovered evidence claim is a mischaracterization of what he claims occurred during his PCRA proceedings. He maintains that the PCRA court never actually denied relief on the Robinson lab report claim because the court's order stated only that it was granting a new trial as to his two claims of ineffective assistance but did not specifically say that it was denying relief as to all other claims. He further argues that the comments made by the PCRA court at the close of the second hearing cannot serve as a proxy for a ruling on the after-discovered evidence claim and that he therefore had no standing to appeal that claim because there was no adverse ruling from the PCRA court. Accordingly, Petitioner maintains that this Court cannot properly find that he suffered no prejudice as a result of Attorney Bills failing to include the request for remand in his Motion for New Trial because, even though the same claim was raised in his PCRA proceedings, it was never actually denied. This Court disagrees.

The PCRA evidentiary hearing transcripts inform the basis for the PCRA court's order, which implicitly, albeit surely, denied relief on Petitioner's after-discovered evidence claim and which decision was both final and appealable. When the lab report was initially brought up in the hearing on April 21, 2010, the following exchange occurred between counsel for the Commonwealth and the PCRA court:

> MR. WABBY: Now, Your Honor, I will stipulate to the authenticity of the report. I can't question that was part of another homicide record. My problem is . . . there's no evidence to support anything other than they have a report that says x. There's no evidence that would change the outcome of the case. There's no evidence to show how it could be used, no evidence to show it was consistent or inconsistent with the facts and circumstances of this case. There's nothing. It is hanging with no support.

24

> THE COURT:  Although I tend preliminarily, at least, to agree with you, Mr. Wabby, I would like to complete the court record for appellate issue, if possible.  I understand you have someone that you would call to the stand on this issue.
>
> MR. WABBY:  That's correct.
>
> THE COURT:  So without making a ruling either way, I would just like to have a complete record.

Transcript of Evidentiary Hearing dated April 21, 2010 at 17-18.  The PCRA court then received testimony on the claim, and, when it later pronounced its ruling and explained its reasoning for granting Petitioner relief on the two ineffective assistance of counsel claims at the conclusion of the second hearing, it specifically noted that "[t]he fact that the gun was found later belonging to someone else is not so important with me."  Transcript of Evidentiary Hearing dated September 22, 2010 at 7.  In its written order issued later that day, the court stated that Petitioner was "entitled to relief for the reasons stated on the record on September 22, 2010."  ECF No. 47-1 at 647.  While the order did not contain specific language denying Petitioner's remaining claims, including his after-discovered evidence claim, the determination that it implicitly did so is corroborated by both the conduct of counsel, who never moved to issue a ruling on any claims believed to be outstanding, and the Superior Court, who would have remanded the case for consideration of any outstanding claims upon its reversal of the PCRA court's order granting relief.  The denial is further corroborated by the PCRA court's conduct itself who, years later, noted that all prior PCRA petitions had been "fully litigated" when Petitioner sought a ruling on the after-discovered evidence claim that he believed to be outstanding.

In summary, the Court finds that Petitioner has not shown prejudice from Attorney Bills' failure to request a remand in his Rule 720(C) Motion for New Trial.  Therefore, Petitioner's claim

is not "substantial" enough to overcome the default of claim one under the *Martinez* exception, if applicable.

### c. **Applicability of the miscarriage of justice exception.**

Petitioner also invokes the miscarriage of justice actual innocence exception to excuse the procedural default of his claims. *See* ECF No. 53 at 12-15. He argues that it is more likely than not that no reasonable juror would have convicted him had the Robinson evidence been presented at trial because the Commonwealth's case relied entirely on circumstantial evidence and the lab report would have been the only forensic evidence presented in the trial that linked anyone to the Brunsvold shooting, which he claims was committed under "extraordinarily similar circumstances" as the shooting on victim Richard Milton by George Robinson.[8]

In determining whether Petitioner has met his burden under the actual innocence standard, the habeas court must consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotations omitted). "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id*. While the *Schlup* standard "does not require absolute certainly about the petitioner's guilt or innocence[,]" it is a "demanding" standard and "permits review only in the extraordinary case." *Id*. (internal quotation omitted). The petitioner must demonstrate that "in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *Id*.

---

[8] According to Petitioner, both involved a white man walking alone at night on a residential street, the assailant was a stranger to the victims, there was no apparent motive for the shootings, and the victims had no money or valuables taken from them.

Petitioner is mistaken that the Robinson evidence, in consideration with all the evidence, meets the extraordinarily high *Schlup* actual innocence standard. In fact, it is not evidence of Petitioner's innocence at all, but merely a lab report that states that the bullet submitted in Petitioner's case matched the bullet submitted in the case against George Robinson, shootings that occurred almost four years apart. As testified to by Detective Weismantle at Petitioner's PCRA hearing, it is not uncommon for guns to "travel." The fact that the gun involved in the Brunsvold shooting was later found to be used by Robinson does not raise sufficient doubt as to Petitioner's guilt to undermine confidence in the trial's outcome. The Court thus concludes that Petitioner has failed to satisfy the high standards set forth in *Schlup* for establishing the "fundamental miscarriage of justice" exception to overcome the procedural default of his claims.

### 3. <u>Claims three and four are subject to AEDPA deference.</u>

Claims three and four are premised on the ineffective assistance of Petitioner's trial counsel, Attorney Bills. In claim three, Petitioner asserts that his trial counsel, Attorney Bills, was ineffective for failing to "appropriately handle" the continued references to Petitioner's criminality, criminal lifestyle, gang involvement and other bad behavior at trial. In claim four, Petitioner asserts that Attorney Bills was ineffective for eliciting testimony from Petitioner at trial regarding past crimes that was otherwise inadmissible. Both of these claims were raised before the PCRA court in Petitioner's first PCRA proceedings. The PCRA court held two hearings, and, following the second, the PCRA court granted Petitioner relief in the form of a new trial, finding trial counsel was constitutionally deficient by: (1) eliciting otherwise inadmissible testimony on Petitioner's prior convictions; and (2) failing to prevent or rectify numerous references to Petitioner's criminal lifestyle. ECF No. 47-1 at 647. The PCRA court concluded that counsel's

errors prejudiced Petitioner to the extent that a new trial was warranted, but the Superior Court reversed on appeal. *Id*. at 758-73.

Because claims three and four were denied on the merits, this Court's review of them is very limited. It is not for this Court to decide whether the Superior Court's decision was right or wrong. Rather, under AEDPA's standard of review, as codified in relevant part at 28 U.S.C. § 2254(d)(1), it is Petitioner's burden to show that the Superior Court's adjudication was "contrary to, or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States," or, as codified in relevant part at 28 U.S.C. § 2254(d)(2), was an "unreasonable determination of the facts in light of the evidence presented." Here, the "clearly established Federal law" is that which is set forth by the United States Supreme Court in *Strickland*.

In *Strickland*, the Supreme Court recognized that a defendant's Sixth Amendment right to the assistance of counsel for his defense entails the right to be represented by an attorney who meets at least a minimal standard of competence. *Id*. at 685-87. "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance[.]" *Burt*, 571 U.S. at 24.

Under *Strickland*, it is Petitioner's burden to establish that his "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id*. at 687. The Supreme Court has emphasized that "counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment[.]'" *Burt*, 571 U.S. at 22 (quoting *Strickland*, 466

U.S. at 690); *Richter*, 562 U.S. at 104 ("A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.") (quoting *Strickland*, 466 U.S. at 689).  Counsel cannot be deemed ineffective for failing to raise a meritless claim.  *See, e.g.*, *Preston v. Sup't Graterford SCI*, 902 F.3d 365, 379 (3d Cir. 2018).

*Strickland* also requires that Petitioner demonstrate that he was prejudiced by counsel's alleged deficient performance.  This places the burden on him to establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  Under *Strickland*, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

The Supreme Court in *Strickland* noted that although it had discussed the performance component of an ineffectiveness claim before the prejudice component, there is no reason for an analysis of an ineffectiveness claim to proceed in that order.  466 U.S. at 697.  If it is more efficient to dispose of an ineffectiveness claim because the petitioner failed to meet his burden of showing prejudice, a court need address only that prong of *Strickland*.  *Id*.

In his Petition, Petitioner argues that the Superior Court's decision was both "contrary to" and an "unreasonable application" of *Strickland*, and further argues that the Superior Court made unreasonable determinations of fact.  He therefore maintains that he has overcome AEDPA deference so that this Court can review his claims *de novo* and grant him habeas relief because his counsel was ineffective under *Strickland*.

The relevant portion of the Superior Court's opinion as to claims three and four is as follows:

The Commonwealth argues counsel was constitutionally effective in his representation of [Petitioner] at trial, despite counsel's failure to object to all references to [Petitioner]'s prior criminal activity or in introducing, through [Petitioner]'s testimony, prior convictions that would not have been admissible as impeachment evidence. Even if counsel's performance was in some way deficient, the Commonwealth essentially contends [Petitioner]'s confessions to the Danville witnesses demonstrate [Petitioner] was not unduly prejudiced by counsel's alleged errors. In short, the Commonwealth maintains the jury found [Petitioner] guilty based on his own admissions, and any references to unrelated criminal conduct did not affect the verdict. The Commonwealth also claims any prejudice was mitigated by the court's limiting instruction to the jury concerning the prior bad acts evidence. For these reasons, the Commonwealth concludes the court erred in awarding [Petitioner] a new trial. We agree.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 669 (1984). When asserting a claim of ineffective assistance of counsel, the petitioner is required to demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. Kimball*, 724 A.2d 326 (1999). Counsel is presumed to be effective, and the failure to satisfy any prong of the test for ineffectiveness will cause the claim to fail. *Commonwealth v. Williams*, 950 A.2d 294 (2008).

"The threshold inquiry in ineffectiveness claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit . . . ." *Commonwealth v. Pierce*, 645 A.2d 189, 194 (1994). "Once this threshold is met we apply the 'reasonable basis' test to determine whether counsel's chosen course was designed to effectuate his client's interests." *Id*. at 194-95. If there is no reasonable basis for counsel's action, we move to the final point of analysis under *Strickland*/*Pierce* – prejudice. *Kimball*, *supra*. In determining prejudice, a court "must consider the totality of the evidence before the judge or jury." *Commonwealth v. Simmons*, 804 A.2d 625, 640 (2001).

A defendant is entitled to a fair trial, not a perfect trial. *Commonwealth v. Robinson*, 877 A.2d 433, 443 (2005). The actual prejudice required under *Strickland*/*Pierce* is a higher standard than the harmless error analysis typically applied when assessing allegations of trial court errors. *Commonwealth v. Gribble*, 863 A.2d 455, 472 (2004). A defendant raising an ineffectiveness claim is required to show counsel's ineffectiveness was of such magnitude that it "could have reasonably had an adverse effect on the outcome of the proceedings." *Pierce*, 527

A.2d at 977.  In other words, there must be a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different. *Commonwealth v. Cox*, 863 A.2d 536, 546 (2004).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Commonwealth v. Chambers*, 807 A.2d 872, 883 (2002).

Pennsylvania Rule of Evidence 404(b) prohibits the use of evidence of a person's past crimes, wrongs, or acts to prove that person's character and show action in conformity.  Pa.R.E. 404(b).  At its core, Rule 404(b) seeks to prevent misuse of other acts evidence; specifically, that jurors might convict a defendant because they perceive the defendant has a bad character or propensity to commit crimes. *Commonwealth v. Cascardo*, 981 A.2d 245, 251 (Pa. Super. 2009) (quoting *Commonwealth v. Hacker*, 959 A.2d 380, 392 (Pa. Super. 2008)).  When prior bad acts evidence is offered for some other legitimate purpose – for example, where the evidence is relevant and part of the chain or sequence of events that contributed to the natural development of the facts – it may be admissible.  *Cascardo*, *supra* at 250.  In these circumstances, the bad acts evidence is not offered for a prejudicial purpose, but to show the "complete story" and provide the jury with the context needed to understand the evidence or testimony at issue.  *Id.*

In the present case, it was evident from the beginning of [Petitioner]'s trial that he had made the three potentially incriminating statements while being detained in a juvenile-confinement facility for unrelated crime.  The Danville witnesses gave [Petitioner]'s statements background by explaining the goals of the facility were rehabilitative and accomplished through intervention-type counseling. A critical part of the counseling involved residents taking responsibility for their criminal past to move forward; in the process of this disclosure, [Petitioner] admitted his involvement in the shotting.  Testimony concerning [Petitioner]'s prior criminal lifestyle was admissible because it provided the context and circumstances under which [Petitioner] made the inculpatory statements.  *See Cascardo*, *supra* at 250 (noting "other crimes" evidence is admissible where evidence formed history of case and was part of natural development of facts).  Without this background information, [Petitioner]'s statements would appear random, and the jury would be left with an unexplained gap surrounding his statements.

Counsel also properly objected to the most harmful bad acts evidence. When the testimony touched specific references to [Petitioner]'s prior criminal behavior – here, his gang membership and involvement in drive by shootings – trial counsel objected, the court sustained the objection, and it instructed the jury to disregard those specific references.  During the final charge, the court instructed the jurors that evidence of [Petitioner]'s confinement for unrelated crimes and past criminal history was admissible only for the purpose of showing the circumstances under which [Petitioner] had made the inculpatory statements.  The court also cautioned the jury that the evidence could not be considered proof of bad character

from which the jurors could infer guilt. *See Commonwealth v. Mollett*, 5 A.3d 291 (Pa. Super. 2010), *appeal denied*, 14 A.3d 826 (2011) (stating jury is presumed to follow court's instructions).

[Petitioner]'s inability to show counsel's alleged errors unduly prejudiced the outcome of his trial is most fatal to [Petitioner]'s claims of counsel's ineffectiveness. In light on [Petitioner]'s three statements referencing his involvement in the Brunsvold murder, [Petitioner] failed to demonstrate how the verdict could have been different if counsel had been able to exclude all references to [Petitioner]'s criminal past. We reject the PCRA court's conclusion that the conviction itself was evidence of the prejudice suffered by [Petitioner] as a result of his counsel's ineffective representation. The court's conclusion is misguided because it neglects to account for [Petitioner]'s own statements. On three separate occasions and to three different people, [Petitioner] made statements implicating himself in the shooting. [Petitioner]'s admissions effectively defeat [Petitioner]'s attempt to show a reasonable probability that, but for counsel's errors, the outcome of [Petitioner]'s trial would have been different.

The inconsistencies in [Petitioner]'s own testimony also harm his claims of prejudice. Throughout [Petitioner]'s trial, counsel repeated the theme that [Petitioner] was prepared to do or say anything to get out of Danville, and did just that by feigning cooperation in the Brunsvold murder investigation. [Petitioner] initially testified consistently with his trial strategy when he admitted he had made the statement to Allan Clark in an attempt to obtain an early release from Danville *via* cooperation with authorities. In the next breath, however, [Petitioner] undermined that strategy when he denied making the statements attributed to him by Donna Heath and William Groover. The jury was free to reject [Petitioner]'s testimony as disingenuous.

In addition, the court's instructions sufficiently warned the jury not to consider evidence of [Petitioner]'s prior crimes or criminal past for an improper purpose. (See N.T. Trial, 10/2/00, 69-70) (providing instructions for jury to consider bad acts evidence for limited purpose only). Thus, even if trial counsel had been able to exclude all references to [Petitioner]'s prior bad acts and criminal lifestyle, the result at trial would probably have been the same. *See Mollett*, *supra*. In other words, [Petitioner]'s admissions were enough to support the jury's guilty verdict.

Counsel also elicited testimony from [Petitioner] regarding his prior convictions for harassment and possession of a firearm. These specific crimes would not have been admissible as crimes of dishonesty to impeach [Petitioner] on cross-examination. *See Commonwealth v. Williams*, 573 A.2d 536, 538 (1990) (stating firearms conviction is not crime of dishonesty and is inadmissible to impeach defendant's credibility or honesty); *Commonwealth v. Jenkins*, 523 A.2d

813, 815 (Pa. Super. 1987) (observing defendant could not be impeached based on his conviction for harassment because it is not crime involving dishonesty). Given [Petitioner]'s admissions to the Danville witnesses, however, we question whether counsel's actions created sufficient prejudice to undermine confidence in the verdict. Consequently, [Petitioner]'s claim of counsel's ineffectiveness in connection with eliciting [Petitioner]'s testimony concerning his harassment and firearms convictions does not entitle him to PCRA relief.

      For the foregoing reasons, we conclude the PCRA court erred when it granted [Petitioner] a new trial on the grounds alleged. Accordingly, we reverse.

ECF No. 47-1 at 765-72.

As reflected in the above passage, the Superior Court did not decide whether Petitioner's trial counsel was deficient with respect to his allegations of ineffective assistance in claims three and four. Therefore, if Petitioner is able to overcome AEDPA deference with regard to the Superior Court's application of the *Strickland*'s prejudice prong then *Strickland*'s deficient performance prong would be subject to *de novo* review. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim *de novo*.")

### a.  The Superior Court's decision was not "contrary to" *Strickland*.

Petitioner argues that the Superior Court applied a heightened, outcome-determinative prejudice standard that is more demanding than that required by *Strickland*. *See* ECF No. 36 at 57. If Petitioner is correct and the Superior Court did in fact apply a more demanding prejudice standard than that required by *Strickland*, then its adjudication was "contrary to" *Strickland* under § 2254(d)(1). *See Williams*, 529 U.S. at 405-06 (declaring as contrary to *Strickland* a state court's rejection of a prisoner's ineffective assistance claim "on the ground that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different"); *see also Rogers v. Superintendent Greene SCI*, 80 F.4th 458, 464-65 (3d

Cir. 2023) (finding the state court's decision was "contrary to" *Strickland* because it applied an "outcome determinative standard" instead of the "reasonable probability" standard).

Here, the Superior Court correctly described the standard for prejudice under *Strickland* and specifically concluded that Petitioner had not demonstrated "a reasonable probability that, but for counsel's errors, the outcome of [his] trial would have been different."  ECF No. 47-1 at 770. This is the correct legal standard.[9]  *See Strickland*, 466 U.S. at 694 (requiring only "a reasonable probability that . . . the result of the proceeding would have been different.")  While the state court articulated *Strickland*'s standard in three parts, and federal courts set it out in two, the Third Circuit has made it clear that this test does not contradict *Strickland* since the legal evaluation is the same. *See Werts v. Vaughn*, 228 F.3d 178, 202-04 (3d Cir. 2000) ("[A] state court decision that applied the Pennsylvania [ineffective assistance of counsel] test did not apply a rule of law that contradicted *Strickland* and thus was not 'contrary to' established Supreme Court precedent."); *see, e.g.*, *Commonwealth. v. Mitchell*, 105 A.3d 1257, 1266 (Pa. 2014) ("this Court has divided [*Strickland*'s] performance component into sub-parts dealing with arguable merit and reasonable

---

[9] Notwithstanding no misstatement here, the Supreme Court has cautioned federal courts reviewing a state prisoner's habeas petition to not be too quick to assume that the state court applied the wrong law, even if the state court was imprecise in language it used in evaluating a claim, particularly when a frequently applied and well-known standard such as *Strickland* is at issue. *Woodford v. Visciotti*, 537 U.S. 19, 23-24 (2002) (finding the Court of Appeals for the Ninth Circuit's "readiness to attribute error [to the state court] is inconsistent with the presumption that the state courts know and follow the law," and is "also incompatible with § 2254(d)'s 'highly deferential standard for evaluating state-court rulings,' which demands that state court decisions be given the benefit of the doubt.").  In *Visciotti*, the Supreme Court admitted that even it has stated imprecisely *Strickland*'s prejudice standard at points in some of its decisions, and noted that the California Supreme Court's shorthand reference to the *Strickland* standard that was not entirely accurate "can no more be considered a repudiation of the standard than can this Court's own occasional indulgence in the same imprecision."  537 U.S. at 24 (citing *Mickens v. Taylor*, 535 U.S. 162, 166 (2002); *Williams*, 529 U.S. at 393).

strategy.  Appellant must, therefore, show that: the underlying legal claim has arguable merit; counsel had no reasonable basis for his act or omission; and Appellant suffered prejudice as a result."); *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1117-18 (Pa. 2012) ("In order to obtain relief on a claim of ineffectiveness, a PCRA petitioner must satisfy the performance and prejudice test set forth in *Strickland*[.]").

The Supreme Court has stated that "a run-of-the-mill state court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406.  Such is the case here.  The Superior Court identified *Strickland* as the controlling legal authority and, applying that framework, denied relief.  Therefore, the state court's decision was not "contrary to" clearly-established Federal law and the question now becomes whether its decision was an objectively "unreasonable application" of that law.

### b.  The Superior Court's decision was not an "unreasonable application" of *Strickland*.

In claim three, Petitioner argues that the Superior Court unreasonably applied *Strickland* when it determined that he was not prejudiced by counsel's alleged errors in failing "to adequately object to repeated, inadmissible, and inflammatory references by Danville counselors to [his] 'criminality,' 'criminal lifestyle' and other alleged instances of [his] bad acts and criminal behavior during their testimonies."  ECF No. 36 at 39.  Petitioner states that the jury heard 17 different references to his criminal lifestyle and other bad behavior that had nothing to do with the Brunsvold killing.  *Id*. at 40-41.  While the record reflects that counsel properly objected to the most harmful bad acts evidence, he did not request a cautionary instruction until after the sixteenth comment, and Petitioner states that it was impossible to "unring" the bell with a buried after-the-fact jury

35

instruction days after the remarks were made. *Id*. at 53. As previously noted, the Superior Court found that even if counsel had been able to exclude all references to Petitioner's criminal past, Petitioner failed to show a reasonable probability that the result of his trial would have been different "[i]n light of [his] three statements referencing his involvement in the Brunsvold murder[.]" ECF No. 47-1 at 770. According to Petitioner, the Superior Court applied a "heightened, outcome determinative standard" and "failed to weigh the evidence as a whole" when it determined whether a reasonable probability of a different outcome existed, and he claims the court instead incorrectly analyzed prejudice as depending on the sufficiency of the evidence by stating that the outcome would have been the same no matter any attorney errors because of Petitioner's statements. *Id*. at 48. This, he claims, was a misapplication of *Strickland*. *Id*.

In claim four, Petitioner argues that the Superior Court unreasonably applied *Strickland* when it determined that Petitioner had not demonstrated sufficient prejudice from the jury hearing of his inadmissible prior convictions given his admissions to the Danville witnesses. *Id*. at 56-61. He again argues that the Superior Court applied an "outcome-determinative" standard and failed to "weigh the evidence as a whole" by appropriately considering the prejudicial impact that hearing about a prior firearms conviction had on the jury in which the victim died by a gunshot wound. *Id*. at 57. He also maintains that the Superior Court unreasonably applied *Strickland* when it determined that the "limiting jury instructions given during the charging conference erased any potential prejudice to [him]" because neither of the two relevant sections "directly told the jury how they should consider the firearms and harassment convictions." *Id*. at 60.

Under the "unreasonable application" provision of § 2254(d)(1), the appropriate inquiry is whether the state court's application of *Strickland* to the petitioner's ineffectiveness claim was

objectively unreasonable, *i.e.*, the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under *Strickland*. To satisfy his burden under § 2254(d)(1), a petitioner must do more than convince the court that the state court's decision denying a claim was incorrect. *Dennis v. Sect'y, Pennsylvania Dept. of Corr.*, 834 F.3d 263, 281 (3d Cir. 2016). He must show that it "'was *objectively* unreasonable.'" *Id.* (quoting *Williams*, 529 U.S. at 409). This requires that he establish that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Under the deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard, there is no basis for this Court to conclude that the Superior Court's adjudication of Petitioner's two ineffective assistance of counsel claims was an "unreasonable application" of *Strickland*. While Petitioner is correct that *Strickland* prejudice does not depend on the sufficiency of the evidence despite counsel's mistakes, *see Strickland*, 466 U.S. at 694 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."), and that the court "must consider the totality of the evidence" when deciding whether the *Strickland* standard has been satisfied, *id.* at 695, he fails to acknowledge that such calculation includes the consideration of "the *strength* of the evidence," too. *See Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999) (emphasis added).

Here, Petitioner faults the Superior Court for essentially ignoring the prejudicial impact of the repeated references to his criminality and its pervasive effect on the jury with regard to how it received the evidence and his own testimony. He also claims that the Superior Court failed to

appropriately consider the taint on his credibility and the prejudicial impact caused by the admission of his prior juvenile adjudication for possession of a firearm and adult conviction for harassment. However, Petitioner fails to acknowledge the strength of the evidence against him – his own statements – which is powerful evidence that cannot be ignored when one considers whether there is a reasonable probability that, absent counsel's alleged errors, the outcome would have been different. In fact, in this Court's opinion, it was the PCRA court, not the Superior Court, that failed to consider the totality of the evidence before the jury by neglecting to account for Petitioner's own inculpatory statements. As Respondents aptly point out, even if the jury had not heard evidence of Petitioner's criminal past, it would have heard that he implicated himself in the Brunsvold shooting on three separate occasions. The Superior Court determined that, in light of this evidence, there was no reasonable probability that, absent counsel's errors, the result of his trial would have been different. This was a correct statement of the law, and, despite Petitioner's assertions to the contrary, there is no indication that the Superior Court applied a more demanding standard by incorrectly analyzing prejudice as depending on the sufficiency of the evidence, an analysis that would indeed reflect a misapplication of *Strickland*. *See*, *e.g.*, *Saranchak v. Secretary, Pa. Dept. of Corr.*, 802 F.3d 579, 598 (3d Cir. 2015) (finding that the PCRA court's repeated misstatements of the law indicated that the PCRA court "misapprehended *Strickland*'s prejudice prong.") Instead, the Superior Court's opinion reflects that it did consider all the evidence, including Petitioner's own testimony denying his involvement in the shooting and the statements attributed to him by the Danville witnesses. Assuming that the Superior Court applied an incorrect standard simply because it found that Petitioner's admissions effectively defeated his attempt to show a reasonable probability of a different outcome ignores the far more reasonable conclusion

that the state court found Petitioner's admissions to be particularly damning in a case with very little other evidence.  *See Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (Section 2254 requires us to apply a "highly deferential standard for evaluating state-court rulings" and give state court decisions "the benefit of the doubt[;]" we must presume "that state courts know and follow the law.") (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).  For these reasons, Petitioner has not met his burden of showing that the Superior Court's decision was an objectively unreasonable application of *Strickland*'s prejudice prong.

Petitioner's arguments concerning the trial court's limiting instructions to the jury are also unavailing.  Petitioner testified to seven different adjudications and convictions, and the jury was provided with unambiguous instructions about how it should properly use this evidence.  The jury is presumed to follow its instructions, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), and nothing in the record suggests that the jury was "confused" simply because the instructions did not reference how the jury should consider the firearms and harassment convictions specifically.  Therefore, there is no basis to question the Superior Court's adjudication on this issue, either.

### c. The Superior Court's decision was not an "unreasonable determination of the facts."

Petitioner also claims that he has overcome AEDPA deference under the § 2254(d)(2) prong because the Superior Court unreasonably determined the facts in finding that the prior bad act evidence in the form of testimony from the Danville witnesses concerning Petitioner's criminal lifestyle was admissible.  Relevant here, the Superior Court found that the Danville witnesses' testimony referring to Petitioner's prior criminal lifestyle was admissible to "complete the story" and "provide context" for the circumstances under which Petitioner made the inculpatory statements.  ECF No. 47-1 at 768-69.  According to the Superior Court, "without this background

39

information, [Petitioner's] statements would appear random, and the jury would be left with an unexplained gap surrounding his statements." *Id.* at 769. Petitioner, however, argues that this was an unreasonable determination of the facts because the testimony had no bearing on "the story" of the Brunsvold killing, nor did it explain why he was at Danville or talking to the counselors there. ECF No. 36 at 45-47.

Though Petitioner presents this argument under the § 2254(d)(2) prong, the Superior Court's decision did not involve any "determination of facts" regarding the Danville witnesses' testimony. The standard of review set forth at § 2254(d)(2) applies when a petitioner "challenges the factual basis for" the state court's "decision rejecting a claim[.]" *Burt*, 571 U.S. at 18. "[A] state court decision is based on an 'unreasonable determination of the facts' if the state court's factual findings are 'objectively unreasonable in light of the evidence presented in the state-court proceeding,' which requires review of whether there was sufficient evidence to support the state court's factual findings." *Dennis*, 834 F.3d at 281 (quoting § 2254(d)(2) and citing *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

The standard of review set forth at § 2254(d)(2) is not applicable because no decision rendered by the Superior Court that is at issue herein was premised upon a finding of fact made by it or the PCRA court. Rather, the Superior Court applied the historical facts of record to Petitioner's claims. For example, it cited the undisputed testimony of the Danville witnesses, applied Pennsylvania law and determined that the testimony concerning Petitioner's prior criminal lifestyle was admissible. This admissibility finding regarding prior bad act evidence involved no "determination of fact," nor did the Superior Court's finding that Petitioner had not demonstrated that, absent counsel's alleged errors with regard to the handling of the prior bad act evidence and

his prior convictions, there is a reasonable probability that the outcome of his trial would have been different.  However, to the extent that § 2254(d)(2) arguably applies to this Court's review of any of Petitioner's claims, Petitioner has not overcome the burden imposed by it.  That is, he has not demonstrated that the Superior Court's decision rejecting a claim was based upon an unreasonable determination of the facts.[10]

### D. Certificate of Appealability

AEDPA codified standards governing issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition.  It provides that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from . . . the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by the State court[.]"  28 U.S.C. § 2253(c)(1)(A).  It also provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  *Id*. § 2253(c)(2).

"When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  When a district court has rejected a constitutional claim on its merits, "[t]he petitioner

---

[10] Finally, even if Petitioner was able to overcome AEDPA deference, the Court notes that it would deny claims three and four even under a *de novo* review because Petitioner has failed to prove prejudice in that there is a reasonable probability that, but for counsel's errors, the result of his trial would have been different.

must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* Applying this standard here, Petitioner has not made the requisite showing. Accordingly, a certificate of appealability will be denied. A separate order will be entered.

Dated: January 3, 2025

/s/ Kezia O. L. Taylor
KEZIA O. L. TAYLOR
United States Magistrate Judge

Cc:    Counsel of record
       (*via CM/ECF electronic mail*)